UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

2008 JUN -4 A 9:51

ALLAN PETERSEN, Petitioner,

vs. Civil Action No.2:08-cv-0040-WKW

DARLENE DREW, WARDEN, Respondent.

## DECLARATION/AFFIDAVIT OF ALLAN PETERSEN

In accordance with the provisions of Section 1746 of Title 28, United States Code, I, the undersigned Allan A. Petersen, do hereby make the following declaration/affidavit pertinent to the above-styled cause of action:

1. I am a federal prisoner housed at the Federal Prison Camp in Montgomery, Alabama since **May 31, 2007.** I was committed to the Federal Bureau of Prisons holding facility in Guyanabo, Puerto Rico on **December 07, 1995, after I was found guilty by jury trial and remanded back into custody. See: Respondent's Attachment 4,** p.3 of 21 and Exhibit-A [Inmate History Quarters].

2. The name of the federal prison in Puerto Rico was called "Metropolitan Detention Center Guaynabo" where I remained in the custody of the Bureau of Prisons from **December 07, 1995 until September 11, 1996,** when I arrived at FCI Ray Brook, New York. **I remained in MDC Guaynabo in the custody of the Bureau of Prisons and was transfer for sentencing by the District Court in St. Thomas on July 1, 1996, and returned back to MDC Guaynabo in Puerto Rico.** As such, my date of committment into the Bureau of Prisons is December 07, 1995, and not September 11, 1996.

3. My previous jail time credit before I was bonded, was from **February 17, 1995 to February 22, 1995.** I was placed on bond on **February 22, 1995 until December 07, 1995, when it was revoked after trial concluded without**

**incident. I NEVER COMMITTED A BOND VIOLATIONS ON DECEMBER 7, 1995,** WHY MY BOND WAS REVOKED. THIS WAS DONE ON THE MOTION OF THE GOVERNMENT AFTER TRIAL CONCLUDED ON DECEMBER 7, 1995. Therefore, the declaration of Jeff Johnson at Paragraph 5 is incorrect. There was no bond violation, I was found guilty to conspiracy only on that day, and bond was revoked by the Court on a motion of the Government.

4. Beginning from December 7, 1995, to present, I have remained continuously in the custody of the Bureau of Prisons along with the previous credited dates of my arrest between February 17, 1995 to February 22, 1995.

5. On July 1, 1996, I was sentenced by the district court of St. Thomas Virgin Islands to 188 months of imprisonment, which is equivalent to: **15 years and 8 months. 85% Percent of 188 months = 159.8 months, which is rounded to 160 months. 160 months = 13 years and 4 months.**

6. 13 years and 4 months beginning from December 7, 1995, when my imprisonment begin just after trial concluded, results in a statutory release date of **April 7-8, 2009. Now, with six (6) months pre-release time afforded pursuant to 18 USC § 3621(b), the pre-release date is correctly established on October 7-8, 2008.**

7. However, now with the requirements of the Second Chance Act of 2007, the maximum time allowed for pre-release RRC placement is increased to 12 months **(from 6 months)**, and there is no longer a limit based on the percentage of term to be served. Moreover, written approval must be obtained from the Regional Director if staff determine that a period in excess of six months may be needed on an individual case. **See: Exhibit-B:[Program on Second Chance Posted by the BOP at Montgomery in every unit].**

8. Based upon the Second Chance Act, **(signed into law April 9, 2008)** I am now eligible for a maximum of up to 12 months pre-release RRC placement which is equivalent to the date of **April 7-8, 2008. See Respondents**

**Response at page 8, stating:**

> **"He has a good conduct time release date of March 19, 2008. Petitioner is non-violent and nothing in his history or the nature and circumstances of his offense indicate he would pose a safety issue in the community."Id.**

Moreover, Jeff Johnson's Declaration is in accordance also with a statutory pre-release date of **March 07, 2008** as shown in paragraph 7:

> **"Projected Release Date: 07-30-2009**
> **Minus the date of form: 03-07-2008"**
> **-----------------------------------**

which Program Statement 5100.08 instructs for pre-release classification, designation and **REDESIGNATION** procedures on Months to release:

> **188 months x 85% = 159.8 months.**
> **Round to the nearest whole number = 160 months.**
> **Subtract jail time credit of 213 days from 160 months = 153 months/3 days to release. 153 months & 3 days = 12 years 9 months & 3 days. 12 years 9 months & 3 days beginning from July 1, 1996 (beginning date of computation of sentence) = April 4, 2009 for statutory release date.**

9. Thus, six (6) months RRC placement from the date of April 4, 2009, provides a date of release on October 4, 2008. Twelve months under the Second Chance Act, provides a earlier date of release on April 4, 2008.

10. On May 8, 2008, I was called to Case Manager Michael Rowe office to quickly sign papers related to a progress report that indicated 6 months was the amount of time I would get for placement to a RRC. No questions was asked to myself concerning my financial status of how I received funds, or how much I owed to child support, or what was the economical status on living in the Virgin Islands. Moreover, no question was asked of myself as to whether six (6) months was sufficient for my reintergration into society after serving 12 plus years in federal prison. Simply put, Case Manager Rowe explained myself that he was given a cap at six (6) months from his superiors for RRC placement in my case, and he could not request more time to the Regional Office for myself, which I requested based upon my needs, and the amount of time I remained incarcerated from society. I explained him that

as a Bureau of Prison's Rule, inmates serving longer sentences require longer prerelease programming as stated in Martin v. Willingham, 430 F.Supp.2d 82 (D.Conn. 2006) at oral argument. In that case, it states:

> "By their terms, the February 2005 regulations constitute a categorical exercise of discretion, providing that inmates will not be transferred to a CCC until the later of 10% of time served or 6 months prior to his or her release date, **which respondent explained at oral argument reflects the BOP's view that inmates serving longer sentences require longer prerelease programming.**"Id.
>
> **Martin 430 F.Supp.2d at 86.**

11. On May 8, 2008, Case Manager Rowe never consulted myself on a individual basis of my circumstances surrounding child-support in which I am in debt for **$36,637.14** to the Department of Justice Paternity and Child Support Division, and the fact that, I have a son 12 years old [**Allany Mendez Petersen**] whom I have to also support financially upon my release. **See: [Exhibit C1 and C2].**

12. The BOP relied on 28 C.F.R. §§ 570.20-570.21, February 2005 regulations that provides that inmates will not be transferred to a CCC until the later of 10% of **TIME SERVED or 6 MONTHS prior to his or her release date.** This is proven from the fact that, **BEFORE MAY 8, 2008,** as early as 2003 to 2004, I was given prerelease date of **01-24-2009,** and a projected GCT release date of **07-24-2009. See: [Exhibit D][Sentence Computation Data & Program Review Report]**. Moreover, the BOP enacted no new policies on RRC program placement for inmates besides 28 CFR §§ 570.20-570.21 which is the only policy used by the BOP. More proof on this issue is revealed in the document called: [**Community Based Program Agreement**] which Case Manager Michael Rowe had myself signed on May 8, 2008, which states in part:

> "I understand that my participation in home confinement will be an alternative to placement in a CCC **for no more than the last six months or 10% of my sentence, whichever is less.**"Id.

**See: [Exhibit F].**

The BOP's Rule pursuant to 28 CFR § 570.21, which has been ruled invalid by several Circuit Court of Appeals **(refer to previous petition filed)** is the only Regulation governing my release date at this time, despite the Second Chance Act affords up to 12 months prerelease. The language of 28 CFR § 570.21 remains as follows:

> **"§ 570.21 When will the Bureau designate inmates to community confinement?**
> **(a) The Bureau will designate inmates to community confinement only as part of pre-release custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months.**
> **(b) We may exceed these time-frames only when specific Bureau programs allow greater periods of community confinement, as provided by separate statutory authority (for example, residential substance abuse treatment program (18 U.S.C. 3621 (e)(2)(A)), or shock incarceration program (18 U.S.C. 4056(c))."Id.**

13. On May 8, 2008, I also spoke with Unit Manager Ms. Perryman on the issue of receiving more than six (6) months placement in a RRC Program, since the new law **(Second Chance Act of 2007)** changed the policy to receive **12 months placement and there is no longer a limit based on the percentage of the term to be served.** I was told also by Ms. Perryman that she believes six months is sufficent for everyone to get themselves together in a prerelease program. I explained to her that --- St. Thomas, Virgin Islands economy is extremely high to live there, and it strives only on tourism unlike the United States. I further explained that I have child support payments which is my responsibility and a 12 years old son I have to take care of financially when I am released. Moreover, I explained that the policy on the Second Chance Act indicates that written approval must be obtained from the Regional Director if staff determine that a period in excess of 6 months may be needed on an individual basis, and I would like my case to be referred to the Regional Director for more time in excess of six months. However, Ms. Perryman responded in the same fashion with six months being a blanket rule as a maximum for prerelease to a RRC programming. The posted policy in

all units at FPC Montgomery by staff indicated such procedures would be done. **See: Exhibit-B.** Moreover, it is also documented in the Pro se Paralegal News Reporter in May of 2008, in the same fashion. **See: Exhibit-G.**

14. Additional evidence that shows the BOP staff are following the procedures 28 CFR § 570.21, is the clear fact that Case Manager Michael Rowe cited in his declaration Program Statement 7310.04, as his guide in paragraph 5 for assessment of myself. Within Program Statement 7310.04, is the following statement:

> **5. STATUTORY AUTHORITY. 18 U.S.C. § 3624(c), provides: The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, or the last ten per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's reentry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation Office shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody. Id.**
>
> **18 U.S.C. § 3621(b) provides:**
> **The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility ... the Bureau determines to be appropriate and suitable. A CCC meets the definition of a penal or correctional facility. Id.**
>
> **Therefore, the Bureau is not restricted by § 3624(c) in designating a CCC for an inmate and may place an inmate in a CCC for more than the "last ten per centum of the term," or more than six months, if appropriate.**
>
> **Section 3624(c), however, does restrict the Bureau in placing inmates on home confinement to the last six months or 10% of the sentence, whichever is less. Id.**

**See: Program Statement Memorandum 7310.04 [Exhibit-H].**

15. On May 8, 2008, I informed Case Manager Michael Rowe that I can be placed in a RRC program on the island of Puerto Rico for an additional 6 months to be readjusted in the community, which would also help me to support my children before placement in home confinement on St. Thomas, Virgin Islands. This proposal was not taken into account by him, since he

never made assessment of it in his declaration. Instead, he claimed I would need to give him another release residence address or relocate, which is not a requirement for the program. I was employed from 1987 until my arrest in February 1995, under contract with the Jimmy Stevens Productions, Inc. of Santurce, Puerto Rico and earned $500 per show. **See: Exhibit-I [Presentence Report on Employment].**

16. Thus, a RRC or CCC meets the definition of a penal or correctional facility, which the Bureau is authorized to designate myself to once it is appropriate or suitable, as it is in this case. St. Thomas, Virgin Islands is only 30 minutes by plane from San Juan, Puerto Rico, where my release residence is. However, I still have family in Puerto Rico which are my cousins located at Los Angeles, 50 San Juan, Puerto, Rico. This assessment for placement into a CCC/RRC was not taken into account by Case Manager Rowe. His assessment is simply based upon 6 months towards Home Confinement placement, without the additional 6 months to a CCC/RRC placement which is recommended for prerelease. There is nothing in my records, or the files of the Bureau of Prisons that limits me from receiving 6 months halfway house placement to a CCC/RRC, and 6 months home confinement after 12 plus years in the Bureau of Prisons. I have lost home, apartment, finances, vehicle, employment, spousal support due to divorce, and I have excessive child support that I owe. Moreover, I have a son and a daughter below the age of 16, who are dependant upon me for support. With that said, I believe I should be granted 6 months halfway house to a CCC/RRC program in Puerto Rico beginning as early as July of 2008, and 6 months home confinement thereafter on the Island of St. Thomas, Virgin Islands in accordance with the Second Chance Act of 2007, and Program Statement 7310.04.

17. No attempt was made to contact the U.S. Probation Officer over my case with a letter of referral to a CCC/RRC placement in Puerto Rico for his or her approval as required. On April 9, 2008, after the Second Chance Act of 2007 was signed into law, prerelease custody requirements in the Bureau of Prisons changed removing the 10% percent and six months limitation for prerelease placement at the end of a prisoner's sentence. Instead, it is now changed to receive up to 12 months, and its for the portion of the final months, instead of 10% percent. The laws states:

> **(c) PRERELEASE CUSTODY** -
> (1) In General - The Director of the Bureau of Prisons **SHALL** to the extent practicable, ensure that a prisoner serving a term of imprisonment **SPENDS A PORTION OF THE FINAL MONTHS OF THAT TERM NOT TO EXCEED 12 MONTHS,** under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility. Id.

18. Based upon this new law of the Second Chance Act of 2007, I am eligible for prerelease CCC/RRC placement as early as July 30, 2008, which is 12 months prior to the BOP's calculated Statutory Release date of July 30, 2009. However, according to the accuracy of the calculation for placement and redesignation on months to release, the date of prerelease have already been past which is between March and April of 2008, considering a 12 months placement pursuant to PS 5100.08, which is mandatory.

At Chapter 6, Page 5, of Program Statement 5100.08, at Months to Release date, the program states as follows:

> **MONTHS TO RELEASE DATE**
> **If there is a current and valid sentence computation in SENTRY, SENTRY will automatically enter the number of months remaining into this field. If however, there is not a complete Sentence Computation/Projected Release Date in SENTRY, this entry MUST BE manually computed. This item is not figured into the security point total but impacts the Sentence Length Public Safety Factor. Id.**

I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746, the above statements and facts are true and correct to the best of my knowledge belief and recollection of the events surrounding this case and my finances.

Executed this 1st day of June 2008.

Mr. Allan A. Petersen, 03533-094
Federal Prison Camp Montgomery,
Mobile G-Unit,
Maxwell Air Force Base,
Montgomery, Alabama 36112.

**EXHIBIT A**

MXRSZ 531.01 * INMATE HISTORY * 05-11-2007
PAGE 001 * QUARTERS * 11:09:51

REG NO..: 03533-094 NAME....: PETERSEN, ALLAN A
CATEGORY: QTR FUNCTION: PRT FORMAT:

| FCL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|---|---|---|---|---|
| MRG | C02-006U | HOUSE C/RANGE 02/BED 006U | 05-01-2007 1849 | CURRENT |
| MRG | Z03-035LAD | HOUSE Z/RANGE 03/BED 035L AD | 04-22-2007 1610 | 05-01-2007 1849 |
| MRG | Z03-031LAD | HOUSE Z/RANGE 03/BED 031L AD | 04-18-2007 1315 | 04-22-2007 1610 |
| MRG | Z01-009LAD | HOUSE Z/RANGE 01/BED 009L AD | 04-18-2007 1131 | 04-18-2007 1315 |
| MRG | Z01-016LAD | HOUSE Z/RANGE 01/BED 016L AD | 04-17-2007 2203 | 04-18-2007 1131 |
| MRG | Z03-031LAD | HOUSE Z/RANGE 03/BED 031L AD | 04-17-2007 1814 | 04-17-2007 2203 |
| MRG | C02-001L | HOUSE C/RANGE 02/BED 001L | 03-21-2006 1543 | 04-17-2007 1814 |
| MRG | Z05-057UAD | HOUSE Z/RANGE 05/BED 057U AD | 03-20-2006 1436 | 03-21-2006 1543 |
| MRG | C02-001L | HOUSE C/RANGE 02/BED 001L | 02-20-2006 1326 | 03-20-2006 1436 |
| MRG | C04-019U | HOUSE C/RANGE 04/BED 019U | 02-02-2006 1637 | 02-20-2006 1326 |
| SEY | M04-025U | HOUSE M/RANGE 04/BED 025U | 01-19-2006 1204 | 02-02-2006 0700 |
| SEY | M04-024U | HOUSE M/RANGE 04/BED 024U | 01-19-2006 1143 | 01-19-2006 1204 |
| SEY | P03-008L | HOUSE P/RANGE 03/BED 008L | 01-12-2006 1038 | 01-19-2006 1143 |
| SEY | P01-010U | HOUSE P/RANGE 01/BED 010U | 01-06-2006 2006 | 01-12-2006 1038 |
| SEY | P01-008U | HOUSE P/RANGE 01/BED 008U | 12-07-2005 0858 | 01-06-2006 2006 |
| SEY | C01-013L | HOUSE C/RANGE 01/BED 013L | 05-03-2005 0841 | 12-07-2005 0858 |
| SEY | C01-013U | HOUSE C/RANGE 01/BED 013U | 06-21-2004 1656 | 05-03-2005 0841 |
| SEY | C02-025U | HOUSE C/RANGE 02/BED 025U | 05-13-2004 1518 | 06-21-2004 1656 |
| SEY | C02-039U | HOUSE C/RANGE 02/BED 039U | 04-28-2004 1540 | 05-13-2004 1518 |
| SEY | C01-010U | HOUSE C/RANGE 01/BED 010U | 04-28-2004 1130 | 04-28-2004 1540 |
| PEM | Z02-161LAD | HOUSE Z/RANGE 02/BED 161L AD | 04-27-2004 2033 | 04-28-2004 0423 |
| PEM | Z01-112LO | HOUSE Z/RANGE 01/BED 112L O | 04-27-2004 1823 | 04-27-2004 2033 |
| PEM | R01-001L | HOUSE R/RANGE 01/BED 001L | 04-27-2004 1629 | 04-27-2004 1823 |
| PEM | R01-001L | HOUSE R/RANGE 01/BED 001L | 04-27-2004 1607 | 04-27-2004 1611 |
| ATL | J02-230U | HOUSE J/RANGE 02/BED 230U | 04-23-2004 1852 | 04-27-2004 0537 |
| ATL | R01-001L | HOUSE R/RANGE 01/BED 001L | 04-23-2004 1530 | 04-23-2004 1852 |
| MIM | E05-002LH | HOUSE E/RANGE 05/BED 002L H | 04-22-2004 2241 | 04-23-2004 0913 |
| MIM | R01-001L | HOUSE R/RANGE 01/BED 001L | 04-22-2004 2026 | 04-22-2004 2241 |
| GUA | C08-220L | HOUSE C/RANGE 08/BED 220L | 02-04-2004 0936 | 04-22-2004 1452 |
| GUA | C06-124L | HOUSE C/RANGE 06/BED 124L | 10-21-2003 0000 | 02-04-2004 0936 |
| GUA | R01-001L | HOUSE R/RANGE 01/BED 001L | 10-20-2003 1734 | 10-21-2003 0000 |
| ATL | J02-214U | HOUSE J/RANGE 02/BED 214U | 10-08-2003 0926 | 10-08-2003 0929 |
| ATL | J02-214U | HOUSE J/RANGE 02/BED 214U | 10-06-2003 2158 | 10-07-2003 0928 |
| ATL | R01-001L | HOUSE R/RANGE 01/BED 001L | 10-06-2003 2016 | 10-06-2003 2158 |
| PEM | R01-001L | HOUSE R/RANGE 01/BED 001L | 10-06-2003 0155 | 10-06-2003 0350 |
| PEM | Z04-238UAD | HOUSE Z/RANGE 04/BED 238U AD | 10-01-2003 2306 | 10-06-2003 0155 |
| PEM | Z04-250UAD | HOUSE Z/RANGE 04/BED 250U AD | 10-01-2003 2304 | 10-01-2003 2306 |
| PEM | Z01-112LO | HOUSE Z/RANGE 01/BED 112L O | 10-01-2003 2148 | 10-01-2003 2304 |
| PEM | R01-001L | HOUSE R/RANGE 01/BED 001L | 10-01-2003 1530 | 10-01-2003 2148 |
| SEY | C01-007U | HOUSE C/RANGE 01/BED 007U | 09-26-2002 1133 | 10-01-2003 1115 |
| SEY | C01-012U | HOUSE C/RANGE 01/BED 012U | 05-28-2002 1300 | 09-26-2002 1133 |

G0002 MORE PAGES TO FOLLOW . . .

MXRSZ 531.01 * INMATE HISTORY * 05-11-2007
PAGE 002 OF 002 * QUARTERS * 11:09:51

REG NO..: 03533-094 NAME....: PETERSEN, ALLAN A
CATEGORY: QTR FUNCTION: PRT FORMAT:

| FCL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|---|---|---|---|---|
| PEM | R01-001L | HOUSE R/RANGE 01/BED 001L | 05-28-2002 0501 | 05-28-2002 0513 |
| PEM | Z04-232LAD | HOUSE Z/RANGE 04/BED 232L AD | 05-21-2002 1453 | 05-28-2002 0501 |
| PEM | Z03-206UDS | HOUSE Z/RANGE 03/BED 206U DS | 05-21-2002 0241 | 05-21-2002 1453 |
| PEM | Z01-112LO | HOUSE Z/RANGE 01/BED 112L O | 05-20-2002 2019 | 05-21-2002 0241 |
| PEM | R01-001L | HOUSE R/RANGE 01/BED 001L | 05-20-2002 1858 | 05-20-2002 2019 |
| ATL | J01-131L | HOUSE J/RANGE 01/BED 131L | 05-13-2002 2225 | 05-20-2002 0621 |
| ATL | R01-001L | HOUSE R/RANGE 01/BED 001L | 05-13-2002 1952 | 05-13-2002 2225 |
| OKL | E04-604U | HOUSE E/RANGE 04/BED 604U | 04-29-2002 1845 | 05-13-2002 0920 |
| PHL | R01-001L | HOUSE R/RANGE 01/BED 001L | 04-29-2002 1146 | 04-29-2002 1148 |
| PHL | D04-451U | HOUSE D/RANGE 04/BED 451U | 04-23-2002 1955 | 04-29-2002 1052 |
| PHL | D04-460U | HOUSE D/RANGE 04/BED 460U | 04-23-2002 1848 | 04-23-2002 1955 |
| PHL | R01-001L | HOUSE R/RANGE 01/BED 001L | 04-23-2002 1508 | 04-23-2002 1848 |
| FTD | W02-172U | HOUSE W/RANGE 02/BED 172U | 04-22-2002 1154 | 04-23-2002 1322 |
| FTD | F02-193U | HOUSE F/RANGE 02/BED 193U | 12-10-2001 0814 | 04-22-2002 1154 |
| FTD | F02-196U | HOUSE F/RANGE 02/BED 196U | 04-16-2001 1243 | 12-10-2001 0814 |
| FTD | W02-201U | HOUSE W/RANGE 02/BED 201U | 04-06-2001 1712 | 04-16-2001 1243 |
| FTD | U01-001L | HOUSE U/RANGE 01/BED 001L | 04-06-2001 1215 | 04-06-2001 1712 |
| LEW | M03-101L | HOUSE M/RANGE 03/BED 101L | 04-04-2001 1445 | 04-06-2001 0558 |
| LEW | R01-001L | HOUSE R/RANGE 01/BED 001L | 04-04-2001 1333 | 04-04-2001 1445 |
| RBK | D01-110U | HOUSE D/RANGE 01/BED 110U | 11-23-1999 0635 | 04-04-2001 0545 |
| RBK | D05-205U | HOUSE D/RANGE 05/BED 205U | 11-23-1999 0632 | 11-23-1999 0635 |
| RBK | D01-110U | HOUSE D/RANGE 01/BED 110U | 04-27-1999 1627 | 11-23-1999 0632 |
| RBK | D01-104U | HOUSE D/RANGE 01/BED 104U | 03-18-1999 1006 | 04-27-1999 1627 |
| RBK | D01-102U | HOUSE D/RANGE 01/BED 102U | 08-05-1998 0737 | 03-18-1999 1006 |
| RBK | DEL A | DELAWARE A | 02-09-1998 1624 | 08-05-1998 0737 |
| RBK | DEL | DELAWARE UNIT | 02-03-1998 1656 | 02-09-1998 1624 |
| RBK | ADM DET | SEGREGATION | 01-31-1998 1656 | 02-03-1998 1656 |
| RBK | DEL | DELAWARE UNIT | 09-11-1996 1835 | 01-31-1998 1656 |
| RBK | R&D | RECEIVING AND DISCHARGE UNIT | 09-11-1996 1505 | 09-11-1996 1835 |
| LEW | H-3 | H-3 CELLROOM | 09-09-1996 1945 | 09-11-1996 0528 |
| LEW | R/D | RECEIVING & DISCHARGE | 09-09-1996 1825 | 09-09-1996 1945 |
| OKL | 3D | HOLDOVER GENERAL POPULATION | 08-23-1996 1915 | 09-09-1996 0700 |
| GUA | 3B 123 | RM 123 | 08-01-1996 1845 | 08-23-1996 1312 |
| GUA | 3B 123 | RM 123 | 08-01-1996 0942 | 08-01-1996 1407 |
| GUA | 3B 123 | RM 123 | 01-19-1996 0724 | 08-01-1996 0944 |
| GUA | 3B | QTR | 12-07-1995 2200 | 01-19-1996 0724 |
| GUA | R&D | RECEIVING AND DISCHARGE | 12-07-1995 1733 | 12-07-1995 2200 |
| GUA | SHU A | ADM DET 4TH FL A WING | 02-22-1995 0801 | 02-22-1995 0805 |
| GUA | SHU A | ADM DET 4TH FL A WING | 02-22-1995 2338 | 02-22-1995 0800 |
| GUA | R&D | RECEIVING AND DISCHARGE | 02-17-1995 1849 | 02-17-1995 2338 |

G0000 TRANSACTION SUCCESSFULLY COMPLETED

**EXHIBIT B**

## Second Chance Act of 2007 & Pre-Release RRC Placements

The Second Chance Act of 2007 (the "Act"), signed into law on April 9, 2008, changes the Bureau of Prisons' (BOP) statutory authorities for making pre-release residential re-entry center (RRC) placement decisions. The changes are described below:

- The maximum time allowed for pre-release RRC placement is increased to 12 months (from 6), and there is no longer a limit based on the percentage of term to be served. The maximum time allowable for pre-release home confinement remains 6 months, or 10 percent of the term of imprisonment for that inmate, whichever is shorter.

- BOP staff will approach every inmate's assessment with the understanding that the inmate **is now eligible** for a maximum 12-month pre-release RRC placement.

- Staff will review inmates for pre-release RRC placements **17-19 months before** their projected release dates.

- Inmates previously reviewed for pre-release RRC placement, but not yet transferred to an RRC, will be reconsidered using the new standards allowing a maximum 12-month placement.

- Written approval must be obtained from the Regional Director if staff determine that a period in excess of six months may be needed on an individual case.

- Pre-release RRC placement decisions must be made on an individual basis in every inmate's case according to new criteria identified in the Act, in addition to criteria in 18 U.S.C. § 3621(b), which include resources of the facility being considered, the nature and circumstances of the offense, and the history and characteristics of the inmate.

- Sentencing court orders, recommendations, or requests directing an inmate's placement in an RRC lack binding effect, so the BOP is **not required** to follow such directives.

- The BOP will be issuing new federal regulations regarding pre-release RRC placements. This process takes several months to complete. BOP staff will be notified as soon as the new regulations take effect.

EXHIBIT C1

*222372* *222372*

| PAYMENT COUPON FOR: 11/03 | PAYMENT COUPON FOR: 11/03 |
|---|---|
| AMOUNT ENCLOSED $ ____ | AMOUNT ENCLOSED $ ____ |
| NEW TELEPHONE NBR: ____ | NEW TELEPHONE NBR: ____ |
| NCP PIN: 4088616 | NCP PIN: 4088616 |
| PAYMENTS WILL BE APPLIED TO ALL CASES OF THE PAYOR. | PAYMENTS WILL BE APPLIED TO ALL CASES OF THE PAYOR. |
| __ CHECK & PRINT NEW ADDRESS ON BACK | __ CHECK & PRINT NEW ADDRESS ON BACK |

PETERSEN, ALLAN ANDREW
EST NADIR 33-26
ST THOMAS VI 00802

STATEMENT DATE 11/07/03

TERRITORY OF VIRGIN ISLANDS
DEPARTMENT OF JUSTICE - PATERNITY AND CHILD SUPPORT DIVISION
CHILD SUPPORT TERRITORIAL AUTOMATED REPORTING SYSTEM

CASE ID: 1022173 CP NAME: LAURA TROTMAN

| DISTRIBUTION DATE | DESCRIPTION | $ AMOUNT |
|---|---|---|
| | ENDING BALANCE AS OF : 09/30/2003 | 24,659.60 |
| | OBLIGATION CHARGES AS OF : 10/01/2003 | 300.00 |
| 11/01/03 | CHILD SUPPORT | 300.00 |

| ACCOUNT BALANCE AS OF 09/30/03 | + | 10/3 DEBITS | - | 10/3 CREDITS | = | BALANCE AS OF 10/31/03 | OBLIGATIONS FOR 11/03 | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|
| 24,659.60 | | 300.00 | | .00 | | 24,959.60 | 300.00 | 25,259.60 |

MAKE CHECKS PAYABLE TO : DEPARTMENT OF JUSTICE
PATERNITY AND CHILD SUPPORT DIV.
8000 NISKY CENTER, 2ND FLOOR
SUITE 500, ROOM #525
ST. THOMAS VI 00802-

IF YOU HAVE ANY QUESTIONS ABOUT THIS INVOICE PLEASE CONTACT THE PATERNITY AND CHILD SUPPORT DIVISION AT 775-3070.

*DO NOT SEND MONEY FOR OBLIGATIONS THAT ARE COVERED BY AN INCOME WITHOLDING ORDER.

EXHIBIT C1

*212718* *212718*

| | | |
|---|---|---|
| PAYMENT COUPON FOR: 09/03 | I | PAYMENT COUPON FOR: 09/03 |
| AMOUNT ENCLOSED $________________ | I | AMOUNT ENCLOSED $________________ |
| NEW TELEPHONE NBR:________________ | I | NEW TELEPHONE NBR:________________ |
| NCP PIN: 4088616 | I | NCP PIN: 4088616 |
| PAYMENTS WILL BE APPLIED TO ALL | I | PAYMENTS WILL BE APPLIED TO ALL |
| CASES OF THE PAYOR. | I | CASES OF THE PAYOR. |
| __ CHECK & PRINT NEW ADDRESS ON | I | __ CHECK & PRINT NEW ADDRESS ON |
| BACK | I | BACK |

PETERSEN, ALLAN ANDREW
EST NADIR 33-26
ST THOMAS VI 00802

STATEMENT DATE 09/07/03

TERRITORY OF VIRGIN ISLANDS
DEPARTMENT OF JUSTICE - PATERNITY AND CHILD SUPPORT DIVISION
CHILD SUPPORT TERRITORIAL AUTOMATED REPORTING SYSTEM

CASE ID: 1022181 CP NAME: PERSHA STOUT

| DISTRIBUTION DATE | DESCRIPTION | $ AMOUNT |
|---|---|---|
| | ENDING BALANCE AS OF : 07/31/2003 | 11,377.54 |

| ACCOUNT BALANCE AS OF 07/31/03 | + | 8 /3 DEBITS | - | 8 /3 CREDITS | = | BALANCE AS OF 08/31/03 | OBLIGATIONS FOR 09/03 | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|
| 11,377.54 | | .00 | | .00 | | 11,377.54 | .00 | 11,377.54 |

MAKE CHECKS PAYABLE TO : DEPARTMENT OF JUSTICE
PATERNITY AND CHILD SUPPORT DIV.
8000 NISKY CENTER, 2ND FLOOR
SUITE 500, ROOM #525
ST. THOMAS VI 00802-

IF YOU HAVE ANY QUESTIONS ABOUT THIS INVOICE PLEASE CONTACT THE PATERNITY AND CHILD SUPPORT DIVISION AT 775-3070.

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

49. Allan Andrew Petersen was born to the union of Mabel and Autney Petersen on June 24, 1963, on St. Thomas, VI. His father is a retired fireman and his mother is a retired school lunch worker. The defendant has seven siblings: Austin, who is a school teacher on St. Thomas; Alston, who is a messenger on St. Thomas; Alfred Petersen, who is a mechanic in Washington, D.C.; Arthur, who works with the the Department of Human Services on St. Thomas; David, who is a service station attendant on St. Thomas; Denise, who is unemployed and resides with her parents; and Dawn, who is employed at the Water and Power Authority on St. Thomas. David, Dawn, and Denise are triplets.

50. The defendant married Maria Serrano on December 10, 1995, on St. Thomas. There were no children born to this union. Mrs. Serrano-Petersen has two children: Raymond and Michelle Owens, whose father is deceased. Both children reside in New York with their mother. Mr. Petersen has three children: Andre Petersen, age 12, who resides on St. Thomas with his mother, Persha Stout; Allana Petersen, age 3, who resides on St. Thomas with her mother, Laura Trotman; and Allany Mendez, who was born on September 8, 1995 and resides on St. Thomas with his mother, Guarina Mendez. The defendant's name does not appear on Allany's birth certificate but both Ms. Mendez and Mr. Petersen has confirmed that the child is a result of their consensual relationship.

51. The defendant's mother stated that her son was always a progressive child. He was always involved in community activities and would go out of his way to help a stranger. He was very respectful in the family home and never displayed any emotional or behavioral problems. She indicated that their family is a very large, close knit family. She taught all her children right from wrong and purposely would not allow them to associate with other children she thought had questionable character. Mrs. Petersen reported that her son had a normal childhood. Most of his rearing was done in the family's current home in Nadir, St. Thomas. She reported that neither the defendant, his siblings or his parents have had a new car. He does not have a home or land. This, she feels, is not the makings of a major drug distributer and this is why she does not believe that her son was involved in this activity. Mrs. Petersen noted that this situation has been a very trying ordeal for their entire family. The defendant's wife and her two children had to move in to the family's home, which was already badly damaged by Hurricane Marilyn. They eventually returned to New York, where they reside with family members. The defendant's mother reported that she suffers from a back condition, as well as a heart ailment, and this situation has put an extra strain on her

**EXHIBIT-D**

```
  SEYA1   540*23 *              SENTENCE MONITORING                  *      05-11-2004
PAGE 001         *               COMPUTATION DATA                    *      14:39:51
                                  AS OF 05-11-2004

REGNO..: 03533-094 NAME: PETERSEN, ALLAN A

FBI NO...........: 754112DB3                    DATE OF BIRTH: 06-24-1963
ARS1.............: SEY/A-DES
UNIT.............: COASTAL                      QUARTERS.....: C02-039U
DETAINERS........: NO                           NOTIFICATIONS: NO

PRE-RELEASE PREPARATION DATE: 01-24-2009

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  07-24-2009 VIA GCT REL

----------------------CURRENT JUDGMENT/WARRANT NO: 010 ------------------------

COURT OF JURISDICTION...........: VIRGIN ISLANDS
DOCKET NUMBER...................: 3:95CR00073-003
JUDGE...........................: MOORE
DATE SENTENCED/PROBATION IMPOSED: 07-01-1996
DATE COMMITTED..................: 09-11-1996
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO

                 FELONY ASSESS  MISDMNR ASSESS  FINES          COSTS
NON-COMMITTED.:  $50.00         $00.00          $00.00         $00.00

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO       AMOUNT:  $00.00

-------------------------CURRENT OBLIGATION NO: 010 ---------------------------
OFFENSE CODE....:  391
OFF/CHG: 21:846; CONSP. TO POSS. COCAINE WITD.

 SENTENCE PROCEDURE.............: 3559 VCCLEA NON-VIOLENT SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   188 MONTHS
 TERM OF SUPERVISION............:     5 YEARS
 DATE OF OFFENSE................: 02-10-1995

G0002        MORE PAGES TO FOLLOW . . .
```

```
  SEYA1  540*23 *            SENTENCE MONITORING              *     05-11-2004
PAGE 002 OF 002 *              COMPUTATION DATA               *     14:39:51
                               AS OF 05-11-2004

REGNO..: 03533-094 NAME: PETERSEN, ALLAN A

-------------------------CURRENT COMPUTATION NO: 010 --------------------------

COMPUTATION 010 WAS LAST UPDATED ON 04-09-2003 AT SEY AUTOMATICALLY

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010

DATE COMPUTATION BEGAN..........: 07-01-1996
TOTAL TERM IN EFFECT............:   188 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:    15 YEARS      8 MONTHS
EARLIEST DATE OF OFFENSE........: 02-10-1995

JAIL CREDIT.....................:   FROM DATE     THRU DATE
                                    02-17-1995    02-22-1995
                                    12-07-1995    06-30-1996

TOTAL PRIOR CREDIT TIME.........: 213
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 737
TOTAL GCT EARNED................: 432
STATUTORY RELEASE DATE PROJECTED: 07-24-2009
SIX MONTH /10% DATE.............: N/A
EXPIRATION FULL TERM DATE.......: 07-31-2011


PROJECTED SATISFACTION DATE.....: 07-24-2009
PROJECTED SATISFACTION METHOD...: GCT REL
```

```
S0055        NO PRIOR SENTENCE DATA EXISTS FOR THIS INMATE
```

```
  SEYA1   542*22 *            SENTENCE MONITORING              *      05-11-2004
PAGE 001 OF 001 *              GOOD TIME DATA                  *      14:40:01
                              AS OF  05-11-2004

REGNO...: 03533-094    NAME: PETERSEN, ALLAN A
ARS 1...: SEY A-DES                                         VCCLEA NON-VIO
COMPUTATION NUMBER..: 010                       FUNC..: PRT   ACT DT:
LAST UPDATED:  DATE.: 04-09-2003                FACL..: SEY     CALC: AUTOMATIC
UNIT................: COASTAL                   QUARTERS............: C02-039U
DATE COMP BEGINS....: 07-01-1996                COMP STATUS.........: COMPLETE
TOTAL JAIL CREDIT...: 213                       TOTAL INOP TIME.....: 0
CURRENT REL DT......: 05-25-2010 TUE            EXPIRES FULL TERM DT: 07-31-2011
PROJ SATISFACT DT...: 07-24-2009 FRI            PROJ SATISF METHOD..: GCT REL
ACTUAL SATISFACT DT.:                           ACTUAL SATISF METHOD:
DAYS REMAINING......:                           FINAL PUBLC LAW DAYS:

---------------------------GOOD CONDUCT TIME AMOUNTS--------------------------
```

| START DATE | STOP DATE | MAX DIS | POSSIBLE TO FFT | ACTUAL TOTALS DIS | ACTUAL TOTALS FFT | VESTED AMOUNT | VESTED DATE |
|---|---|---|---|---|---|---|---|
| 11-30-1995 | 11-29-1996 | 54 | 0 | | | 54 | 12-14-1996 |
| 11-30-1996 | 11-29-1997 | 54 | 0 | | | 54 | 12-14-1997 |
| 11-30-1997 | 11-29-1998 | 54 | 0 | | | 54 | 12-14-1998 |
| 11-30-1998 | 11-29-1999 | 54 | 0 | | | 54 | 12-14-1999 |
| 11-30-1999 | 11-29-2000 | 54 | 0 | | | 54 | 12-14-2000 |
| 11-30-2000 | 11-29-2001 | 54 | 0 | | | 54 | 12-14-2001 |
| 11-30-2001 | 11-29-2002 | 54 | 0 | | | 54 | 12-14-2002 |
| 11-30-2002 | 11-29-2003 | 54 | 0 | | | 54 | 12-14-2003 |
| 11-30-2003 | 11-29-2004 | 54 | | | | | |
| 11-30-2004 | 11-29-2005 | 54 | | | | | |
| 11-30-2005 | 11-29-2006 | 54 | | | | | |
| 11-30-2006 | 11-29-2007 | 54 | | | | | |
| 11-30-2007 | 11-29-2008 | 54 | | | | | |
| 11-30-2008 | 07-24-2009 | 35 | | | | | |

```
      TOTAL EARNED AMOUNT..........................................:     432
      TOTAL EARNED AND PROJECTED AMOUNT............................:     737
```

G0005        TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED

EXHIBIT 2B

BP-S434.073 **COMMUNITY BASED PROGRAM AGREEMENT** CDFRM
DEC 98

**U.S. DEPARTMENT OF JUSTICE** **FEDERAL BUREAU OF PRISONS**

I, Petersen, Allan A. , Register Number, 03533-094 , hereby authorize employees of the Department of Justice and employees of any facility contracting with the Department of Justice to release any or all of the contents of information in my inmate central file to educational facilities, social agencies, prospective employees, etc., for the purpose of assisting in all phases of community programming and release planning. I also authorize the above persons to advise prospective employers that I am currently in the custody of the U.S. Attorney General serving sentence or under the supervision of the U.S. Parole Commission or U.S. Probation Office. This consent will remain in effect until my release from supervision or until revoked in writing by me. Revocation of this authorization may result in my removal from a community-based correctional program.

I understand that while a resident of a community corrections center or work release program I will be expected to contribute to the cost of my residence through payments to the contractor and I agree to make such payments. I understand that failure to make payments may result in my removal from a community-based program (Not applicable for MINT referrals).

I understand that urinalysis or other Bureau of Prisons authorized testing to detect unauthorized drug or alcohol use may be required as a condition of residence in a community corrections center or work release program, and if required, I agree to submit to such testing. I understand that ingestion of poppy seed products may result in positive test results for unauthorized drug use and is therefore prohibited.

I understand that I am expected to assume financial responsibility for my health care while a resident of a community-based correctional program. Should I be unable or unwilling to bear the cost of necessary medical care I understand that I may be transferred to a suitable institution or facility, at the Governments option, to receive such care. I understand that no medical care may be provided to me at Government expense without prior authorization of the Bureau of Prisons.

I understand that I may be required to cooperate with a substance abuse assessment and participate in any treatment recommended as a result of the assessment.

I understand that I may be required to abide by the conditions of supervision as imposed by the sentencing court or the U.S. Parole Commission, including the payments of fines and restitution and to follow the instructions of the probation officer as if on supervision.

I understand that upon arrival at the community corrections center I may be initially placed in the restrictive Community Corrections Component for a period of orientation. In this component, I will be expected to remain at the CCC unless authorized to leave for employment or other authorized program purposes. Additionally, I understand that social visits and recreational/leisure activities will be confined to the CCC.

I understand that while a resident of a community corrections center or work release program I will be required to abide by the rules and regulations promulgated by such program.

For MINT referrals, I understand that I or the guardian shall assume total financial responsibility for my child's care while I am a resident of a CCC. Should I or the guardian be unable or unwilling to bear my child's financial cost, I will be transferred back to my parent institution immediately. I understand that I understand that no financial support will be provided to my child by the Bureau of Prisons.

PART II

In the event that I am approved for home confinement, I agree to abide by the following conditions related to my legal participation in home confinement.

I understand that my participation in home confinement will be an alternative to placement in a CCC for no more than the last six months or 10% of my sentence, whichever is less. I am aware that I will legally remain in the custody of the Bureau of Prisons and/or the U.S. Attorney General and that failure to remain at the required locations may result in disciplinary action and/or prosecution for escape. Inmate does not agree to 6 months or 10% of sentence as Second Chance Act allows up to 12 months.
I agree to report to my assigned probation officer or the contractor's facility immediately upon reaching my release destination.

I understand that if I decline to participate in the recommended home confinement program I may face administrative reassignment out of the community corrections program.

I agree that during the home confinement period, I will remain at my place of residence, except for employment, unless I am given permission to do otherwise. I also understand that I will be required to pay the costs of the program based on my ability to pay.

I also agree to maintain a telephone at my place of residence without "call forwarding," a modem, "Caller ID" or portable cordless telephones for this period. I also agree that if my confinement is to be electronically monitored, I will wear any electronic monitoring device required, follow procedures specified and not have "call forwarding" on my telephone.

| Inmate's Printed Name and Signature | Date |
|---|---|
| Petersen. Allan A./ Allan Petersen | ~~03533-0~~ 5/8/08 |
| Witness' Printed Name and Signature | Date |
| Michael Rowe/ Michael Rowe | 5-8-08 |

Record copy - CCM; Copy - CCM; Copy - Central File
(This form may be replicated via WP)

Replaces BP-S434.073 dtd NOV 95

THE PRO SE PARALEGAL
NEWS REPORTER. Vol. 11 Edition II
May 2008

5444 East Indiana, No. 379
Phone: 812/303-8455
Email: info@pspsllc.com

Evansville, IN 47715-2857
Facsimile: 812/909-2459
Website: www.pspsllc.com

NEWS! NEWS! NEWS! NEWS! NEWS! NEWS! NEWS! NEWS! NEWS! NEWS! NEWS!

## UPDATE ON SECOND CHANCE LAW / BOP RELEASES TALKING POINTS

We write to help clear up some confusion and questions on the new Second Chance Law. Many of you have expressed interest and concerns regarding the "Non Violent Offenders Pilot Program" portion of the law. Contrary to rumors and the language in the version of the bill from our previous newsletter, the term "Eligible Elderly Offender" means an offender who is "(i) not less than 65 years of age; (ii) serving a term of imprisonment that is not life ...and has served the greater of 10 years or 75% of the term imposed... to which the offender was sentenced; (iii) has not been convicted in the past of any Federal or State crime of violence, sex offense, or other offense described in clause (ii); (iv) has not been determined by the BOP, on the basis of information the Bureau uses to make custody classifications, and in the sole discretion of the Bureau, to have a history of violence, or of engaging in conduct constituting a sex offense or other offense described in clause (ii); (v) who has not escaped, or attempted to escape ..; (vi) with respect to whom the BOP determined that release to home detention under this section will result in a substantial net reduction of costs ...; (vii) who has been determined by the BOP to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention." The law also instructs that the "Attorney General"shall conduct a pilot program to determine the effectiveness of moving eligible elderly offenders to home detention and gives him the authority to waive the requirements of 18 USC § 3624,as necessary for the release of some or all eligible elderly offenders from the BOP to home detention. Perhaps most important, however, is that the BOP even though authorized to implement for any and all "eligible elderly offenders" is ONLY required to conduct the pilot program through at least ONE BOP facility designated by the AG, and shall be carried out during fiscal years 2009 and 2010 (that's September 30th of this year and next year through September 30th, 2010). So for now, we don't know at which BOP institution the program will be implemented. IF one of our readers finds out from a reliable source, we would like to hear about it!

- The following is verbatim from the "Talking Points for Staff Use With Inmates & For Posting"

"The Second Chance Act of 2007 (the "Act") signed into law on April 09, 2008, changes the Bureau of Prisons (BOP) statutory authorities for making pre-release residential reentry center (RRC) placement decisions. The changes are described below:

- The maximum time allowed for pre-release RRC placement is increased to 12 months (from 6), and there is no longer a limit based on the percentage of the term to be served. The maximum time allowable for pre-release home confinement remains 6 months, or 10 percent of the term of imprisonment for that inmate, which ever is shorter.
- BOP staff will approach every inmate's assessment with the understanding that the inmate **is now eligible** for a maximum 12 month pre-release RRC placement.
- Staff will review inmates for pre-release RRC placements **17-19 months before** their projected release dates.
- Inmates previously reviewed for pre-release RRC placement, but not yet transferred to an RRC, will be reconsidered using the new standards allowing a maximum 12 month placement.
- Written approval must be obtained from the Regional Director if staff determine that a period in excess of 6 months may be needed on an individual basis.
- Pre-release RRC placement decisions must be made on an individual basis in every inmate's case according to the new criteria identified in the ACT, in addition to criteria in 18 USC §3621(b), which includes resources of the facility being considered, the nature and circumstances of the offense, and the history and characteristics of the inmate.
- Sentencing court orders, recommendations, or requests directing an inmate's placement in an RRC lack binding effect, so the BOP is **not required** to follow such directives.
- The BOP will be issuing new federal regulations regarding pre-release RRC placements. This process takes several months to complete. BOP staff will be notified as soon as the new regulations take effect."

We hope this may help answer some of your questions. Please feel free, as always, to write or have your family or friends visit our website with your questions or concerns.

ATTENTION: If you were recently sentenced and a state misdemeanor was used to enhance your sentence under the Armed Career Criminal Act, you MAY be entitled to relief from the Supreme Court's recent decision in Begay v. United States, decided on April 16, 2008. CONTACT US TODAY TO LEARN MORE AND FIND OUT IF YOUR SENTENCE IS ILLEGAL AND IF YOU MAY BE ENTITLED TO RELIEF!!!!!





**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

**OPI:** CPD
**NUMBER:** 7310.04
**DATE:** 12/16/98
**SUBJECT:** Community Corrections Center (CCC) Utilization and Transfer Procedure

1. PURPOSE AND SCOPE. To provide guidelines to staff regarding the effective use of Community Corrections Centers (CCCs). This Program Statement defines placement criteria for offenders, requires that staff members start the placement process in a timely manner, and defines the circumstances when inmates may refuse Community Corrections (CC) programs. It also establishes an operational philosophy for CCC referrals that, whenever possible, eligible inmates are to be released to the community through a CCC unless there is some impediment as outlined herein.

CCCs provide an excellent transitional environment for inmates nearing the end of their sentences. The level of structure and supervision assures accountability and program opportunities in employment counseling and placement, substance abuse, and daily life skills.

One reason for referring an inmate to a CCC is to increase public protection by aiding the transition of the offender into the community. Participating in community-based transitional services may reduce the likelihood of an inmate with limited resources from recidivating, whereas an inmate who is released directly from the institution to the community may return to a criminal lifestyle. While clearly dangerous inmates should be separated from the community until completing their sentences, other eligible inmates should generally be referred to CCCs to maximize the chances of successful reintegration into society.

Finally, the scope of this Program Statement has been extended to include CCC consideration/placement of District of Columbia Department of Corrections inmates.

**EXHIBIT H**

2. PROGRAM OBJECTIVES. The expected results of this program are:

a. All eligible inmates will have opportunities to participate in CCC programs to assist with their reintegration into the community, in accordance with their release needs.

b. All inmates will have opportunities to communicate directly with staff who make significant CCC referral recommendations.

c. Referral packets for CCC placement will be timely and complete.

d. Before any inmate is transferred to a CCC, the CCC staff will have the required notice and other documentation.

e. The public will be protected from undue risk.

3. DIRECTIVES AFFECTED

a. Directive Rescinded

| | |
|---|---|
| PS 7310.03 | Community Corrections Center (CCC) Utilization and Transfer Procedures (3/25/96) |

b. Directives Referenced

| | |
|---|---|
| PS 1434.06 | Jurisdiction on Escape Related Issues - Memorandum of Understanding USMS/FBI/BOP (7/25/94) |
| PS 1490.04 | Victim and Witness Notification (2/3/98) |
| PS 5100.06 | Security Designation and Custody Classification Manual (6/7/96) |
| PS 5110.12 | Notifications of Release to State and Local Law Enforcement Officials (1/21/98) |
| PS 5180.04 | Central Inmate Monitoring System (8/16/96) |
| PS 5250.01 | Public Works and Community Service Projects (1/19/93) |
| PS 5264.06 | Telephone Regulations for Inmates (12/22/95) |
| PS 5280.08 | Furloughs (2/4/98) |
| PS 5322.10 | Classification and Program Review of Inmates (9/4/96) |
| PS 5325.05 | Release Preparation Program, Institution (7/18/96) |
| PS 5330.10 | Drug Abuse Programs Manual, Inmate (5/25/95) |
| PS 5380.05 | Financial Responsibility Program, Inmate (12/22/95) |

| | |
|---|---|
| PS 5550.05 | Escape from Extended Limits of Confinement (3/27/96) |
| PS 5553.05 | Escapes/Deaths Notification (9/17/97) |
| PS 5800.07 | Inmate Systems Management Manual (12/24/91) |
| PS 5800.11 | Central File, Privacy Folder, and Parole Mini File (9/7/97) |
| PS 5873.05 | Release Gratuities, Transportation, and Clothing (9/4/96) |
| PS 5882.03 | Fines and Costs (2/4/98) |
| PS 6000.05 | Health Services Manual (9/15/96) |
| PS 6070.05 | Birth Control, Pregnancy, Child Placement, and Abortion (8/9/96) |
| PS 7300.09 | Community Corrections Manual (1/12/98) |
| PS 7320.01 | Home Confinement (9/6/95) |
| PS 7331.03 | Pretrial Inmates (11/22/94) |
| PS 7430.01 | Community Transitional Drug Treatment Services, Inmate (1/20/95) |

18 U.S.C. § 3621(b)
18 U.S.C. § 3624(c)

4. STANDARDS REFERENCED

a. American Correctional Association 3rd Edition Standards for Adult Correctional Institutions: 3-4265, 3-4343, 3-4343-1, 3-4387, 3-4388, 3-4388-2, 3-4389, 3-4391, 3-4393, 3-4393-1

b. American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities: 3-ALDF-3E-04, 3-ALDF-4E-19, 3-ALDF-4E-19-1, 3-ALDF-4F-04, 3-ALDF-4F-05, 3-ALDF-4F-07, 3-ALDF-4G-01, 3-ALDF-4G-06, 3-ALDF-4G-07

c. American Correctional Association 2nd Edition Standards for Administration of Correctional Agencies: 2-CO-4G-01, 2-CO-4G-02

d. American Correctional Association Standards for Adult Correctional Boot Camp Programs: 1-ABC-3D-04, 1-ABC-4E-20, 1-ABC-4F-08, 1-ABC-4F-10, 1-ABC-4G-01, 1-ABC-4G-02, 1-ABC-4G-03, 1-ABC-4G-06

5. STATUTORY AUTHORITY. 18 U.S.C. § 3624(c), provides:

> "The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last ten per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust

to and prepare for the prisoner's reentry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation Office shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody."

18 U.S.C. § 3621(b) provides:

"The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility . . . the Bureau determines to be appropriate and suitable." A CCC meets the definition of a "penal or correctional facility."

Therefore, the Bureau is not restricted by § 3624(c) in designating a CCC for an inmate and may place an inmate in a CCC for more than the "last ten per centum of the term," or more than six months, if appropriate.

Section 3624(c), however, does restrict the Bureau in placing inmates on home confinement to the last six months or 10% of the sentence, whichever is less.

6. <u>PRETRIAL/HOLDOVER AND/OR DETAINEE INMATES</u>. This Program Statement does not apply to pretrial, holdover, or detainee inmates.

7. <u>COMMUNITY-BASED PROGRAMS</u>

a. <u>Community Corrections Centers (CCC)</u>. CCCs, commonly referred to as "halfway houses," provide suitable residence, structured programs, job placement, and counseling, while the inmates' activities are closely monitored. All CCCs offer drug testing and counseling for alcohol and drug-related problems. During their stay, inmates are required to pay a subsistence charge to help defray the cost of their confinement; this charge is 25% of their gross income, not to exceed the average daily cost of their CCC placements. Failure to make subsistence payments may result in disciplinary action.

These contract facilities, located throughout the United States, provide two program components: the Community Corrections Component and the Prerelease Component:

(1) The <u>Community Corrections Component</u> is designed as the most restrictive option. Except for employment and other structured program activities, an inmate in this component is

restricted to the CCC. An inmate shall ordinarily be placed in the Community Corrections Component upon arrival at the CCC.

This orientation period normally lasts for two weeks or until the inmate has demonstrated to CCC staff the responsibility necessary to function in the community. Based on their professional judgment, CCC staff shall determine when an inmate is prepared to advance to the Prerelease Component.

(2) The Prerelease Component is designed to assist inmates making the transition from an institution setting to the community. These inmates have more access to the community and family members through weekend and evening passes.

b. Community Corrections Programs. In addition to a CCC's traditional services, the Bureau also has the following community-based programs. Referral procedures may be described in independent Bureau directives issuances. The Community Corrections Manager (CCM) reviews the inmate's characteristics and the recommendations noted in the referral package to determine if one of the following programs (if available) may be more appropriate than traditional CCC placement.

(1) Comprehensive Sanctions Center (CSC). The CSC concept, initiated by the Bureau, with the extensive cooperation and teamwork of U.S. Probation and CCC contractors, was developed to provide courts with a wider range of sentencing options and to facilitate the development and implementation of community program plans tailored to the individual needs of prerelease inmates.

The CSC is designed to meet the needs of higher risk prerelease inmates and consists of six different levels of supervision, ranging from 24-hour confinement to Home Confinement.

It also may have an intensive treatment component consisting of substance abuse education and treatment, life skills training, mental health counseling, education, employment assistance, and mentoring. The inmate's progress is systematically reviewed by a Program Review Team (PRT), consisting of representatives from the Bureau, U.S. Probation, and the CCC.

(2) Mothers and Infants Together (MINT). MINT is an alternative residential program that promotes bonding and parenting skills for low risk female inmates who are pregnant. The inmate is placed in the program two months prior to delivery and remains there for three months after delivery.

(3) Home Confinement. Home Confinement is a generic term used to cover all circumstances in which an inmate is required to remain at home during non-working hours of the day. Electronic

monitoring equipment is sometimes used to monitor compliance with the program's conditions. These programs provide an opportunity for inmates to assume increasing levels of responsibility, while, at the same time, providing sufficient restrictions to promote community safety and convey the sanctioning value of the sentence.

Home Confinement provides an option for inmates who do not need the structure of a residential facility. Except for inmates who are initially sentenced to and graduate from the Intensive Confinement Center Program, statutory provisions limit the length of Home Confinement to the last 10% of the sentence, or six months, whichever is less. Inmates are required to pay subsistence of 25% of their gross income to defray the costs of Home Confinement and electronic monitoring.

The Bureau is involved in two Home Confinement programs: Home Confinement operates from the Bureau's own network of CCCs and the U.S. Probation Division program.

(a) <u>CCC Contractors</u>. The first form of Home Confinement is CCC contractor-operated programs. In these programs, CCC staff monitor the inmate. Currently, only a few of these programs use electronic monitoring equipment. Supervision is provided by daily telephone contacts and periodic personal contacts in the home and workplace.

(b) <u>U.S. Probation Office</u>. The second form of Home Confinement involves placing federal inmates in programs operated by the U.S. Probation Office. These programs use electronic monitoring equipment with U.S. Probation Officers (USPO) providing supervision.

(4) <u>Transitional Services Program (TSP)</u>. The community-based transition phase of the Bureau's Residential Drug Treatment Program is designed to complement the accomplishments and continue the institutional program's treatment plan. It reinforces the inmate's personal responsibility to lead a drug-free lifestyle through personal accountability for choices, confrontation of negative thinking patterns, and instruction in basic social skills. Inmates who successfully complete the Residential Drug Treatment Program's institutional phase should normally be considered for the maximum 180 day period of CCC placement, if they are otherwise eligible.

(5) Intensive Confinement Center (ICC). A lengthy period of Community Corrections Center confinement follows the completion of the ICC program's institutional phase. The CCC time is divided among the restrictive Community Corrections Component, the Prerelease Component, and Home Confinement. Specific referral procedures are outlined in the ICC Program Statement.

8. RELEASE PLAN. Staff shall begin release planning at an inmate's first team meeting, normally the initial classification, and shall continue throughout the inmate's confinement. The following guidelines apply:

a. Planning early in an inmate's period of confinement is necessary to ensure release preparation needs are identified and appropriate release preparation programs are recommended.

b. Preliminary decisions regarding eligibility for CC Programs are to be made well in advance of the last year of confinement.

c. A final and specific release preparation plan, including a decision as to CCC referral, is normally established at a team meeting no later than 11 to 13 months before an inmate's projected release date.

9. CCC CRITERIA AND REFERRAL GUIDELINES

a. Regular Referrals. Staff shall make recommendations for CCC placements based on assessments of inmate needs for services, public safety, and the necessity of the Bureau to manage its inmate population responsibly. CCCs are a program element and are not to be used as a reward for good institutional behavior, although an inmate's institutional adjustment may be a factor in making a referral determination.

A number of factors must be weighed to determine the length of CCC placement for inmates, including their individual needs and existing community resources. Ordinarily, inmates with shorter sentences do not require maximum CCC placement due to reduced transition needs. Additionally, inmates who are required to spend a portion of time in a CCC as a condition of release (i.e. supervised release or court order) do not require an extended Bureau CCC placement. For example, if the Unit Team determines the inmate needs a six month CCC placement, but the inmate is required to stay in a CCC for 90 days as a condition of release, then the institution shall ordinarily refer the inmate for a 60-90 day CCC placement.

**Referrals to CCM offices should include a recommendation regarding the length of stay (range), such as recommending 60 to 90 days or 90 to 120 days, etc. This range of at least 30 days allows the CCM to match population needs with budgetary and CCC bed space resources, a process which requires this flexibility.**

However, there will be cases when the institution, for various management reasons, wants the CCM to place the inmate not earlier than a specific date. Then, the CCC referral form should specify a recommended placement date rather than a range and further state that the CCM should not adjust that date. The CCM shall adhere to the recommended date, with any adjustment only being downward if budget and/or bed space constraints are a factor.

The following CCC referral guidelines apply:

(1) An inmate may be referred up to 180 days, with placement beyond 180 days highly unusual, and only possible with extraordinary justification. In such circumstances, the Warden shall contact the Regional Director for approval and the Chief USPO in the inmate's sentencing district to determine whether the sentencing judge objects to such placement.

(2) The ultimate goal is to maximize each eligible inmate's chances for successful release and a law-abiding life.

(3) When an inmate has a history of escape or failure in one or more CC Programs, careful review and consideration should be given regarding the suitability of participation and the length of placement.

(4) Inmates with minor medical conditions or disabilities may also be considered for community placement. Inmates are required to assume financial responsibility for their health care while assigned to community programs. Such inmates must provide sufficient evidence to institution staff of their ability to pay for health care while at a CCC prior to the referral being made. When an inmate is unable or unwilling to bear the cost of necessary health care, the inmate shall be denied placement.

(5) Inmates who have been approved for CCC referral and are otherwise appropriate for camp placement shall be transferred to a camp for intermediate placement. The inmate should have completed the Institution Release Preparation Program at the parent institution. The parent institution shall complete the CCC referral packet and the camp should be closer to the inmate's release residence. This process should be completed to allow the

inmate a minimum of a 60 day placement at the camp prior to the acceptance date at the CCC.

b. MINT Referrals. Female inmates are eligible to enter the program at the CCC generally during their last two months of pregnancy. After birth, the mother is allowed three additional months to bond with the child. The mother shall then be returned to an institution to complete her sentence. If she is eligible for prerelease services, she may remain at that facility only if she is going to be supervised in that judicial district.

The CEO may approve early or extended placements with a recommendation by the treating obstetrician and Clinical Director's concurrence. A placement extending beyond 180 days requires the Regional Director's approval. Direct court commitments shall have a secondary designation noted on the Inmate Load and Security/Designation form (BP-337). This shall be used to determine the institution responsible for the inmate's medical expenses while she is confined in the MINT Program.

Authority to pay immediate post-natal care of the child born to an inmate while in custody is derived from administrative discretion when the Bureau finds itself responsible for the cost by default (no other resources can be compelled to pay). It is reasonable that the Bureau provides for the child's medical expenses for the first three days after routine vaginal birth or up to seven days for a Cesarean section.

Prior to the birth, the mother must make arrangements for a custodian to take care of the child. At this time, the CEO shall ensure the person or agency taking custody of the child is also asked to be responsibile for medical care costs beyond three days after birth. (Note: This may be extended by the Regional Director for an additional seven days for extenuating circumstances on a case-by-case basis.) The person(s) receiving custody of the child should sign a Statement of Responsibility for medical care costs, clearly indicating that the signing party accepts financial responsibility. Unit Management staff are responsible for obtaining this statement, and forwarding copies to the Health Services Administrator (HSA) for placement in the HSA's outside hospitalization file and to the Controller (see the Sample Statement of Responsibility (Attachment D)).

Health Services staff shall confirm an inmate's pregnancy and evaluate her medical condition. Health Services staff shall indicate whether CCC placement is medically appropriate and document this on the Medical Evaluation for Transfer of Inmates to CCC Type Facility (BP-351) which shall be forwarded to the Unit Team.

When the Unit Team has concerns regarding the appropriateness of a CCC placement (such as criminal history, severity of current

offense), procedures will be followed according to Section 10.i.(2), Limitations on Eligibility for All CCC Referrals.

The following CCC referral guidelines apply in addition to the guidelines provided for regular referrals:

(1) The inmate must be pregnant upon commitment with an expected delivery date prior to release.

(2) The inmate or guardian must assume financial responsibility for the child's care, medical and support, while residing at the CCC. Should the inmate or the guardian be unable or unwilling to bear the child's financial cost, the inmate may be transferred back to her parent institution.

(3) An inmate who becomes pregnant while on furlough, or has more than five years remaining to serve on her sentence(s), or plans to place her baby up for adoption shall not be referred for MINT placement.

**Referrals to CCMs should state a specific date of placement. This date should be approximately two months prior to the inmate's expected delivery date.**

The CCC's Terminal Report should fully describe the inmate's experience in, and reaction to, the MINT Program. It should also summarize counseling received in the program and include follow-up medical or program recommendations for the institution to facilitate the inmate's transition.

Inmates in need of foster care placement assistance shall be referred to the institution social worker, or if the institution does not have a social worker, staff shall contact a social worker in the community for foster care placement assistance.

10. LIMITATIONS ON ELIGIBILITY FOR ALL CCC REFERRALS. Inmates in the following categories shall not ordinarily participate in CCC programs:

a. Inmates who are assigned a "Sex Offender" Public Safety Factor.

b. Inmates who are assigned a "Deportable Alien" Public Safety Factor.

c. Inmates who require inpatient medical, psychological, or psychiatric treatment.

d. Inmates who refuse to participate in the Inmate Financial Responsibility Program.

e. Inmates who refuse to participate, withdraw, are expelled, or otherwise fail to meet attendance and examination requirements in a required Drug Abuse Education Course.

f. Inmates with unresolved pending charges, or detainers, which will likely lead to arrest, conviction, or confinement.

g. Ordinarily, inmates serving sentences of six months or less.

h. Inmates who refuse to participate in the Institution Release Preparation Program.

i. Inmates who pose a significant threat to the community. These are inmates whose current offense or behavioral history suggests a substantial or continuing threat to the community.

Examples are inmates with repeated, serious institution rule violations, a history of repetitive violence, escape, or association with violent or terrorist organizations.

To determine whether an inmate poses a significant threat, a number of factors must be considered. The key consideration is public safety when assessing the inmate's proclivity for violence or escape against their placement needs.

A waiver of the Public Safety Factor is not required for inmates transferred via unescorted transfer to CCC placements.

Ordinarily, inmates with a single incident of violence should not automatically be excluded from CCC placement. As noted earlier, clearly dangerous inmates should be excluded from CCC placement.

(1) When there exists a basis for significant doubt regarding whether the inmate currently poses a threat to the community, the Warden should consider contacting the Chief USPO in the release district (see the Sample letter (Attachment A)) to seek guidance on the referral's appropriateness. A copy of this letter shall be maintained in the Inmate Central File.

(2) When an inmate is excluded under this subsection, a memorandum, signed by the Warden, shall be prepared and placed in the Inmate Central File to explain the rationale for exclusion from CC Programs.

j. Inmates whose admission and release status is pretrial, holdover, or detainee.

11. REFUSALS. When an eligible inmate refuses CCC placement, staff shall investigate the inmate's reasons. Staff may honor an inmate's refusal of CCC placement.

Suitable reasons to decline placement might include previous CCC failure, potential conflict with other residents, and location or remoteness from release residence. When the inmate does not present a suitable reason, and the unit team believes that a placement would serve a correctional need, the unit team shall make every effort to encourage participation.

When an inmate refuses placement, a memorandum, signed by the Associate Warden (Programs) and the inmate, shall be placed in the Inmate Central File. The memorandum should document the inmate's rationale for refusal and all unit team effort to encourage participation.

12. CCC REFERRAL PROCEDURES. Normally 11 to 13 months before each inmate's probable release date, the unit team shall decide whether to refer an inmate to a Community Corrections program.

Medical staff shall notify the inmate's Case Manager promptly when a pregnancy is verified. Upon notification, the unit team shall decide if a MINT referral to a Community Corrections program will be made.

a. Referral to CCM. Staff shall use the Institution Referral form (BP-210) (Attachment B) when referring an inmate for transfer to a CCC. Information included in the Additional Information (11) and Specific Release Preparation Needs (12) sections must be as specific as possible regarding the inmate's needs.

Attachment B contains instructions for completing the Institution Referral form and related materials. Signed copies of the "Community Based Program Agreement" must be included with all CCC referrals. The Warden is the final decision-making authority for all CCC referrals the unit team recommends.

If the Warden approves the CCC referral, the unit team shall forward two copies of the Institutional Referral form and appropriate attachments to the CCM. Staff shall enter the DST SENTRY assignment of "W CCC ACT." Copies of appropriate documents are prepared so that one may be forwarded to the CCC while the CCM retains the other for reference.

A separate packet with appropriate copies shall be forwarded to the Transitional Services Manager (TSM) in the **receiving region where the inmate is being released** for graduates of Residential Drug Abuse Programs. Staff are referred to the Drug Abuse Programs Manual for responsibilities and/or documentation requirements. If the CCC referral packet is mailed prior to

completion of the Treatment Summary and Referral form (BP-549), the Drug Abuse Treatment Coordinator shall forward the completed BP-549 form to the Transitional Services Manager in the region of the inmate's release and provide a copy to the unit team.

The referral packet shall be forwarded to the CCM at least 60 days prior to the maximum recommended range or date. However, additional time may be required for processing inmates with special community-based program needs (i.e. mental health, drug transition, disabilities, and inmates with higher security needs).

For MINT referrals, the referral packet shall ordinarily be forwarded to the CCM at least 60 days prior to the recommended date. If the inmate is committed to Bureau custody or arrives at the designated facility at any stage during the second trimester of pregnancy, the referral shall be forwarded to the CCM as quickly as possible.

If an inmate is scheduled for release via parole, and CCC placement is for 45 days or less, a copy of correspondence directed to the U.S. Parole Commission (USPC) outlining the release plan and requesting parole certificates, as well as copies of the USPO's letter recommending release plan approval, must be included in the referral package.

b. Mandatory CCC Residence. When an inmate must reside in a CCC as a condition of parole, mandatory release, or supervised release supervision after release from confinement, the institution shall refer the case to the appropriate CCM, who shall refer the case for placement under these procedures:

Institutions shall notify the USPC of cases that cannot be placed (see specific information in Attachment B). Inmates in this category should not be referred for transitional purposes and have this time "stacked" on to the Court or USPC's ordered period of CCC placement.

Inmates releasing from an institution via 3621E CMPL or 4046C CMPL, or who have mandatory CCC residence as a condition of parole, mandatory release, or supervised release supervision, should be referred for release preparation transfer to a CCC, and the CCM should work with U.S. Probation to waive the CCC requirement during the period of supervision. The CCM shall attempt to affect the 180 day release preparation placement for inmates releasing via 3621E CMPL or 4046C CMPL. The CCM shall keep the appropriate U.S. Probation Office apprised of the inmate's progress toward reaching the goals of Community Corrections programming. Should the USPO still require CCC placement as a condition of supervision, the CCM will ordinarily honor the request.

c. Referral to CCC. CCMs shall immediately forward referrals to appropriate CCCs. CCC staff shall notify CCMs in writing of acceptance or rejection. When referrals are accepted, CCCs will send acceptance letters, subsistence collection agreements, and CCC rules and regulations to inmates in care of their Unit Managers. Institution staff shall ensure acknowledgment forms are returned to CCCs. CCMs shall monitor referrals for timely response from contractors.

d. CCC Rejection. CCC staff must provide specific reasons, in writing, to CCMs when they reject referrals. In such cases, CCMs shall determine if further discussion with the CCC staff is appropriate or, if not, referral to an alternate resource is possible. When all placement options have been exhausted, the CCM shall inform the referring institution Warden, with copies to the Unit Manager, that the inmate cannot be transferred to a CCC and the reason for rejection.

e. Transfer Date. When CCMs are notified of an inmate's acceptance by a CCC, a transfer date to the CCC is to be established, and the CCM shall enter the SENTRY destination assignment transaction. The effective date shall be the approved future transfer date.

Destination assignments, "DST," have been established in SENTRY for contract CCCs and work release programs. These assignments use the CCM facility code followed by the contract location code. CCMs may add their contract location destination assignments for inmates in any Bureau facility. When an inmate arrives at the CCC and is admitted to the location (in SENTRY), the destination assignment is automatically removed.

These assignments shall appear on the CCM and institution SENTRY daily log. Institution staff may display rosters of inmates approved for CCC transfer, and CCMs may display lists of pending arrivals by contract location.

The location description (name of the CCC) shall appear on the inmate's profile. If, for any reason, an inmate cannot be

transferred to a CCC on the scheduled date, institution staff shall notify the CCM immediately.

13. PREPARATION FOR TRANSFER

a. Trust Fund Account. No later than **three weeks** prior to the approved transfer date, unit staff are to determine the amount in the inmate's trust fund account that may be given to the inmate at the time of transfer. A check or draft for the balance (with the inmate as payee) shall be sent to the CCC immediately.

In accordance with the Program Statement on Telephone Regulations for Inmates, inmates transferring to CCCs shall be qualified as "exception" cases during the three-week period prior to the approved transfer date for purposes of placing collect telephone calls.

Institution staff should use discretion in giving inmates large amounts of cash, and if there is reason to question an inmate's ability to handle money responsibly, the amount may be reduced.

For inmates who have no funds or resources, unit staff shall determine the extent to which a gratuity is indicated and shall initiate paperwork, if appropriate (see the Program Statement on Release Gratuities, Transportation, and Clothing).

If the institution is holding savings bonds for an inmate, or if an inmate has a savings account at a local bank, the unit staff is to ensure these financial resources are available at the release destination when the inmate arrives.

b. Documentation to CCC. No later than **two weeks** prior to an inmate's approved transfer date, institution staff shall forward the following documents to the CCC:

(1) Authorized Unescorted Commitments and Transfers (BP-385), with current photograph;

(2) Original of the Transfer Order;

(3) Copy of Furlough Application and Approval Record, with specific travel method and itinerary;

(4) Receipt for CCC rules and regulations, if applicable (this may include the CCC's subsistence agreement form); and,

c. Clothing. No later than **one week** prior to an inmate's approved transfer, staff shall make arrangements for release clothing. Suitable release clothing shall be provided as described in the Program Statement on Release Gratuities, Transportation, and Clothing. For non-MINT referrals, at a minimum, release clothing is to include adequate clothing to

complete a job search and perform work. Additionally, an outer garment, seasonably suitable for weather conditions at the inmate's release destination, shall be provided.

d. Medication. No later than **one week** prior to an inmate's approved transfer, Health Services staff shall review the inmate's medical record to determine if the inmate is on continuous medication. When an inmate is transferred to a CCC, a 30-day supply of chronic medication shall be provided pursuant to a new prescription. If an inmate is prescribed a controlled substance, assistance from the CCM may be required to determine if the CCC can accommodate the inmate's special medication needs. Staff should refer to the Health Services Manual for further clarification. CCC staff are to safeguard, store, and dispense controlled substances in accordance with the terms of their Bureau contracts.

e. Identification. It is essential that each inmate have some acceptable form of identification while at a CCC. Therefore, during Institution Release Preparation Programs, unit staff shall assist inmates to acquire social security cards (mandatory) and, if possible, drivers license, and copies of their birth certificates. Additional photo identification may be required if the inmate is using air transportation. These items may be given to an inmate on the transfer date, or mailed to CCCs **prior to** transfer with the materials described in subsection b. above.

f. Community Custody Status. An inmate must be assigned "COMMUNITY" custody status prior to transfer to a CCC. Unit staff shall state the inmate's current custody status if other than "COMMUNITY" on the Transfer Order in the Custody Classification section. Next to the current custody, unit staff shall type "Community custody effective on (whatever date the Warden deems appropriate)."

g. Parole Commission Review of Disciplinary Action. An inmate who has had a discipline hearing resulting in a Discipline Hearing Officer finding, after USPC action to establish a presumptive or effective parole date, may not be transferred to a CCC until the Commission has considered the disciplinary report and final action has been taken.

h. Sentence Calculation. The Inmate Systems Manager (ISM) of the sending institution shall ensure that an inmate's old law sentence computation is "complete" with all appropriate good time entered before the inmate departs the institution.

i. Final Review of 3621(e) Eligibility. The decision to grant an inmate early release is a significant one for the Bureau; therefore, it is essential that unit staff carefully review relevant statutory and regulatory criteria before an inmate's final release under 18 U.S.C. § 3261(e). Specifically, the Unit

Manager or designee must ensure completion of "Final Review of 3621(e) Eligibility" (Attachment K from the Drug Abuse Programs Manual), before unescorted transfer to a CCC or release to a detainer (Drug Abuse Programs Manual, Inmate). Attachment K must be completed and routed to the Warden. Ordinarily, Attachment K should be routed to the Warden along with other CCC release paperwork (i.e., transfer order, furlough application, etc.); however, a copy of Attachment K is not forwarded to the CCC.

The Drug Abuse Program (DAP) Coordinator and CMC must review and sign Attachment K prior to the Warden's review. The DAP Coordinator's review is to ensure that items 5, 7, and 8 are accurate. Once Attachment K is signed and dated, the Unit Manager must ensure that a copy is filed in the disclosable portion of Section 5 (release processing) in the Inmate Central File. The original Attachment K shall be forwarded to the ISM for filing in the Judgment and Commitment (J&C) file.

**No inmate shall be released from an institution to a CCC (or detainer) until the ISM receives the Attachment K with appropriate signatures.**

j. Education. To assist an inmate in securing employment, the inmate should have a resume', a copy of his or her education transcript, GED certificate, and any other education/vocational training certificates completed during his or her confinement.

k. Exemption from Time Requirements. When transfer dates have not been established in time for staff to implement the above procedures within the time requirements, they shall be accomplished as soon thereafter as possible.

14. TRANSFER AND ARRIVAL NOTIFICATION

a. Transportation Costs. Staff are referred to the Program Statement on Furloughs for procedures regarding transportation costs for inmates scheduled for transfer to a CCC.

b. Notification of Travel Schedule. On the date of transfer, the sending institution's ISM shall notify the CCM via BOPNet GroupWise of the inmate's departure and travel schedule. A copy of this notification shall be placed in the inmate's J&C file. If GroupWise is inoperable, the notification shall be made by telephone and documented in the J&C file.

c. Arrival Notification. CCC staff shall notify CCMs immediately when an inmate arrives as a transfer from an institution. Immediately means:

(1) Upon arrival, if during regular CCM working hours; or

(2) At the first opportunity during regular CCM working

hours if arrival is during evenings, weekends, or holidays.

d. Electronic Notification. By close of the business day following an inmate's scheduled arrival, the CCM shall "admit" the inmate in SENTRY, if the CCC has confirmed the inmate's arrival. When GroupWise is inoperable, notification of arrival shall be made by telephone to the sending institution's ISM, and the inmate "admitted" in SENTRY at the earliest opportunity.

e. Escape. If an inmate has not arrived at the CCC within a reasonable period after the scheduled arrival time (no later than 24 hours), the CCM shall report the inmate as an escapee. Then, the ISM at the sending institution must be notified immediately by telephone or GroupWise.

The ISM at the sending institution is responsible for updating SENTRY to indicate the change in release status from "furlough transfer" to "escape" as of the date the inmate fails to report. The ISM at the sending institution also shall make the inmate's sentence computation inoperative as of the date following the escape. Staff at the sending institution shall write an incident report and conduct a UDC/DHO hearing in absentia. The sending institution shall make all notifications required by the Program Statement on Escapes/Deaths Notification. The ISM at the sending institution shall also notify the FBI of the inmate escape. The ISM at the sending institution must also fax a copy of the Notice of Escaped Federal Prisoner (BP-393) to the FBI, U.S. Marshals Service, local law enforcement officials, and law enforcement at the inmate's home of record. The Inmate Central File is to be retained at the sending institution.

The CCM shall notify the U.S. Marshals Service in the CCC district. The CCM shall also notify the Regional Director, the Central Office, and the sending institution via GroupWise of the escape.

f. Arrival Confirmation. The ISM at the sending institution shall use SENTRY to confirm an inmate's arrival at a CCC. When an inmate's arrival is confirmed, the ISM shall forward the following documents to the CCM by certified mail:

(1) Applicable release forms and certificates that have been completed insofar as is possible by unit staff and reviewed by ISM;

(2) Victim/Witness Notification form (BP-323), if applicable;

(3) Completed and current committed fine forms and all related documentation such as the PSI, if applicable;

(4) Copies of conditions of supervised release, if applicable; and

(5) Appropriate forms and other documentation concerning final good conduct time awards for an inmate sentenced under the CCCA.

15. INMATE CENTRAL FILE. The Inmate Central File shall be retained at the institution consistent with provisions established in the Program Statement on Inmate Central File, Privacy Folder, and Parole Mini-files.

/s/
Kathleen Hawk Sawyer
Director

PS 7310.04
12/16/98
Attachment A

Sample letter for Wardens to send to Chief USPOs

John Jones, Chief USPO
Judicial District
Street Address
City, State Zip Code

Re: Doe, John
Reg. No.: 12345-678

Dear Mr. Jones:

The above-noted inmate will complete his/her sentence on _______________ and is being considered for referral to a Community Corrections Center (CCC) on or about _______________ for prerelease services. Because of certain factors in this offender's case, we are closely reviewing his/her appropriateness for CCC placement. Therefore, I am soliciting your view in this matter recognizing that your office will soon be responsible for supervising this offender in the community.

Please indicate below whether or not you favor release through a CCC for this offender. Feel free to attach additional comments. If you favor release through a CCC, I ask that you consider providing some assistance in initiating the supervision process while the offender resides in the CCC. Please return this letter as soon as possible so that release planning can be finalized.

Thank you for your assistance in this matter of mutual concern.

Sincerely,

Warden

___________ Yes, I favor referral to a CCC for prerelease services.

___________ No, I do not favor referral to a CCC.

Comments:______________________________________________________

________________________________________________________________

______________________
Chief USPO
District

______________________
Date

Sample Statement of Responsibility for MINT Referral

Name
Address
City, State Zipcode

RE: DOE, Jane
12345-678

Dear __________:

Jane Doe, an inmate currently confined at the Federal Correctional Institution, ____(city______, ___(state)___, has been accepted into the Mothers and Infants Together (MINT) Program and is tentatively scheduled to furlough transfer to ___(name of facility)_____, ____(address)____, on __________. She has an anticipated delivery date of __________.

Ms. Doe advises that you, the father of the baby, will assume custody of the child, to include financial responsibility for medical care costs upon her release from the MINT Program. She indicated that your telephone number is ____________________.

Accordingly, by signing this letter, you agree to assume custody of the child, including financial responsibility for medical care costs once Ms. Doe is released from the MINT Program.

Please return this letter to the inmate's case manager, _____________. If there are any questions or concerns, please do not hesitate to contact me at ___(full phone number)___.

Sincerely,

XXXXX
Unit Manager

______________________________________________ ____________
Signature of person assuming care and financial responsibility for Ms. Doe's baby / relationship to inmate

Date

cc: CCM
CCC
HSA
Controller
Central File

Employment

57. From October 30, 1989 to December 8, 1995, Mr. Petersen was employed with the Virgin Islands Fire Department on St. Thomas, where he earned $20,100 annually as a firefighter. He was terminated following his conviction in the instant matter.

58. From 1987 until his arrest in February 1995, Mr. Petersen was under contract with Jimmy Stevens Productions, Inc. of Santurce, Puerto Rico, where he earned $500 per performance as a Mocko Jumbi or Stilt Dancer.

59. From November 25, 1985 until October 27, 1989, the defendant was employed with the Virgin Islands Bureau of Corrections on St. Thomas, where he earned $17,800 per year as a correction officer. According to the employer, "Mr. Allan Petersen's attendance was very satisfactory; his industry, reliability and honesty was always dependable, and he was always professional in his line of work." He resigned this position to begin his period of employment with the fire department.

60. From June 29, 1983 to June 28, 1986, Mr. Petersen served in the United States Army National Guard in St. Thomas as a military policeman. He received an Honorable Discharge from his military service obligation on June 28, 1989. His rank at separation was Private II (E-2).

61. Mr. Petersen also reported periods of employment at several local hotels and on several cruise ships, both here and in Puerto Rico, where he performed as a Mocko Jumbie (stilt dancer).

Financial Condition: Ability To Pay

Assets

Cash

| | |
|---|---|
| GERS Contributions | $11,051.28 |
| V.I.Credit Union Savings Account | $ 1,824.19 |
| **Total assets:** | **$12,875.47** |